UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

R. ALEXANDER ACOSTA,

    Plaintiff,

v.

NEW IMAGE LANDSCAPING, LLC, et al.,

    Defendants.
_____/

Hon. Sally J. Berens

Case No. 1:18-cv-429

## OPINION

Plaintiff Eugene Scalia,[1] the Secretary of Labor (Secretary), has sued Defendants New Image Landscaping, LLC and Jeremy Cizauskas, the owner and sole member of New Image, pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 *et seq.* for failing to pay their employees overtime and to keep adequate records. The Secretary alleges that New Image's workers were employees covered by the FLSA. Defendants disagree, claiming that the workers were independent contractors. The Secretary has moved for summary judgment (ECF No. 23), arguing that there is no dispute of material fact that New Image's workers were employees and Defendants thus violated the FLSA's overtime and recordkeeping provisions. The Secretary argues that the undisputed evidence supports an award of liquidated damages and an injunction.

**I.    Background**

    A.    <u>New Image's Business</u>

New Image is a Michigan limited liability company that provides residential and commercial landscaping, lawn mowing, and snow plowing services. Cizauskas is and has been

---

[1] This case was initially filed by then-Secretary of Labor R. Alexander Acosta. Eugene Scalia became the Secretary of Labor in September 2019. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), Eugene Scalia is automatically substituted as the plaintiff.

the sole owner and only member of New Image since its inception. (ECF No. 24-1 at PageID.98–99.) Cizauskas's wife, Tamie Cizauskas, works full time for New Image as a laborer and as its bookkeeper. (ECF No. 24-2 at PageID.182.)

From April of 2016 to August 2017—the relevant period of time for purposes of this litigation—Cizauskas has overseen "the whole operation of everything" in New Image's business, including landscaping, lawn mowing, and snowplowing services. (ECF No. 24-1 at PageID.110.) Cizauskas was New Image's only supervisor and exercised control over all aspects of the business, including supervising workers, setting pay rates, controlling payroll practices, and hiring and firing workers. (ECF No. 24-4 at PageID.241.) New Image obtained clients primarily by word of mouth and entered into contracts with its clients. (ECF No. 24-1 at PageID.112, 170.) Its workers did not recruit clients. (*Id.* at PageID.114.)

B. New Image's Workers

During the relevant period, all of New Image's workers completed an employment application that Cizauskas gave them. (*Id.* at PageID.116.) Cizauskas gave all applicants a chance to work. (*Id.* at PageID.140.) Prior landscaping experience was not required, but if a worker did not know how to do something, Cizauskas would show him or her how to do it.[2] (*Id.* at PageID.118, 150; ECF No. 24-6 at PageID.256.) As Cizauskas put it, "you can train anybody" to do landscaping work. (ECF No. 24-1 at PageID.118.) New Image did not have employment agreements or contracts with its workers addressing commissions or any other form of remuneration paid for landscaping work. (ECF No. 24-5 at PageID.248–250.)

---

[2] Defendants admit that they engaged the individuals listed on Exhibit A to the Secretary's complaint to perform landscaping services for New Image. (ECF No. 24-6 at PageID.254–55.)

Cizauskas supervised all of New Image's jobs. He assigned workers to particular jobs; visited each jobsite to ensure that the work was being performed according to the client's instructions or specifications; taught workers how to do their jobs correctly if they were doing something wrong; and decided when a job was completed. (ECF No. 24-1 at PageID.114, 149–50, 176.) Workers did not hire their own laborers for New Image jobs, although on occasion, an individual that Cizauskas did not hire and did not pay would show up and work on a job. Cizauskas admitted that in such instances, he never asked the individual who they were and why they were working on his job. (*Id.* at PageID.151.)

Workers were provided the equipment they needed to perform the jobs for New Image. This included vehicles, such as trucks and trailers, and lawnmowing and landscaping equipment, such as riding and push mowers, rakes, shovels, blowers, weed-whackers, edgers, a skid steer, and a hydro seeder. (*Id.* at 153, 155–56; ECF No. 24-6 at PageID.256; ECF No. 24-9 at PageID.271.) In the winter, New Image provided trucks with plows and snow shovels for snow removal. (ECF No. 24-1 at PageID.156.) New Image paid for the gasoline for the vehicles and equipment. (*Id.* at 157–58.) Cizauskas repaired the vehicles and equipment and reimbursed workers if they paid for small replacement parts for the equipment themselves. (*Id.* at PageID.119, 159.) A few workers used their own equipment on jobs, usually limited to hand tools or smaller equipment. (*Id.* at PageID.153–54.) In addition, New Image maintained automobile insurance that covered workers who drove its vehicles and Workers' Compensation insurance covering the workers. (*Id.* at PageID.120, 129–30.) New Image also provided workers with t-shirts bearing the New Image name. (*Id.* at PageID.163.) If a worker reported to a jobsite not wearing a company t-shirt, Cizauskas would provide the worker a t-shirt to wear. (ECF No. 24-9 at PageID.271–72.)

Cizauskas verbally reprimanded workers who consistently failed to wear a company shirt to work. (ECF No. 24-8 at PageID.268.)

Many New Image workers worked full-time, year-round and regularly worked in excess of 50 hours per week. (ECF No. 24-7 at PageID.263; ECF No. 24-8 at PageID.268.) Many workers were financially dependent on New Image. (ECF No. 24-8 at PageID. 268; ECF No. 24-9 at PageID.272.) A number of employees worked across multiple years. (ECF No. 24-3.)

### C. New Image's Payroll Practices

Most New Image workers were paid an hourly rate rather than a salary. (ECF No. 24-1 at PageID.141.) Brad DeRuiter, who performed a variety of tasks for New Image, was the sole exception. (*Id.*) Cizauskas determined the hourly rate by considering the minimum wage and setting a rate at between $10 and $12 per hour. He would pay a little more if a worker continued to show up for work or if the worker asked for an increase. (*Id.* at PageID.142.) On approximately five percent of the jobs, Cizauskas paid workers on a per-job basis rather than hourly. (*Id.* at PageID.144–45.) Once determined, a worker's hourly rate generally remained the same from job to job. (*Id.* at PageID.146–147.)

Cizauskas required workers to keep paper timecards with their daily starting and ending times and to turn them in by the end of the week, either Friday or Saturday. He totaled the number of hours per week on the timecards and had his wife, Tamie, emailed the workers' names and numbers of hours to New Image's accountant. (*Id.* at PageID.122.) After the accountant verified the numbers, Tamie printed the checks, and Cizauskas signed and gave them to the workers. (*Id.* at PageID.106, 171.) New Image paid workers on Friday for work done the previous Monday through Saturday. (*Id.* at PageID.104–05.)

New Image did not pay its workers the required time-and-one-half overtime premium for hours worked in excess of 40 each workweek. (ECF No. 24-6 at PageID.255.) In addition, New Image automatically deducted 30 minutes of time from each worker's daily hours for a lunch break, even though workers did not get lunch breaks two to three times per week. (ECF No. 24-7 at PageID.263; ECF No. 24-9 at PageID.273.)

Based on his prior employment, Cizauskas was aware of an employer's obligation to pay its employees time-and-one-half for overtime work. (ECF at Page ID.175.) Cizauskas claims that New Image treated its workers as independent contractors based on advice he received 20 years ago from his first accountant that workers are independent contractors if they use their own vehicles to get to the jobsite and use their own equipment on the jobs. (ECF No. 24-1 at PageID.135–36.) Cizauskas never discussed the issue with his accountants after that time. (*Id.* at PageID.136.)

### D. DOL's Investigation

In August 2017, the Department of Labor's Wage and Hour Division (WHD) initiated an investigation of New Image's compliance with the FLSA's overtime and recordkeeping provisions. On August 22, 2017, WHD investigator Devin Mills met informally with Cizauskas and his attorney to obtain information regarding New Image and its employment and pay practices. (ECF No. 24-7 at PageID.261.) Mills also interviewed a number of New Image's workers. Mills concluded that the workers were actually employees rather than independent contractors and that New Image had failed to comply with the FSLA's overtime requirements. (*Id.* at PageID.262–63.) He further concluded that, by automatically deducting time for lunch breaks that workers did not actually receive, New Image violated the FLSA's recordkeeping requirements. (*Id.* at PageID.263.) Finally, based on his review of New Image's records, Mills determined that New

Image owes back wages of $59,212.86 to 32 workers for the period of April 17, 2016 through August 22, 2017. (*Id.* at PageID.265.)

## II. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

The Secretary argues that he is entitled to summary judgment as to whether New Image's workers were employees covered by the FLSA and whether New Image violated the FLSA's overtime and recordkeeping provisions. The Secretary further argues that the evidence shows that an award of liquidated damages is proper in this case. Finally, the Secretary seeks injunctive relief. Defendants respond that summary judgment is not warranted because issues of fact remain as to the workers' status and whether Defendants acted in good faith and had reasonable grounds for the incorrect classification. Defendants also contend that an injunction is unnecessary to ensure their future compliance with the FLSA.

A number of key issues are not in dispute. First, Defendants meet the FLSA's definition of employer. (ECF No. 6 at PageID.16.) Second, New Image is an enterprise engaged in

commerce or in the production of goods for commerce within the meaning of Sections 3(r) and (s)(1)(A) of the FLSA. (*Id.* at PageID.17.) Finally, in the event the Court concludes that New Image's workers are employees covered by the FLSA, the parties agree that New Image owes back wages of $59,212.86.

### E. Cizauskas's Declaration

Initially, the Court addresses the Secretary's argument that it should strike or ignore Cizauskas's declaration attached to Defendants' response because it improperly purports to contradict portions of Cizauskas's prior deposition testimony. The Sixth Circuit has long recognized the sham affidavit rule, which provides that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). The rule exists because, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 460. However, the Sixth Circuit has cautioned that courts should exercise caution in applying the rule. If the affidavit directly contradicts prior testimony, a court should strike it unless the offering party provides a persuasive justification for the contradiction. *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006). On the other hand, if there is no direct contradiction, a court should consider an affidavit unless it concludes that the affidavit is an attempt to create a sham issue of fact. *Id.*

Upon review of the declaration, the Court notes that some portions contradict Cizauskas's prior testimony, while others do not. For example, Cizauskas's statements regarding his lack of business background and the history of New Image's operations are not contradictory. Some

7

statements, such as that workers "were also paid by the job on occasion" (ECF No. 28-2 at PageID.811), do not materially differ from Cizauskas's prior testimony that job-based payment occurred on about five percent of the jobs. (ECF No. 24-1 at PageID.145.) Other statements either directly contradict Cizauskas's prior testimony or evince an attempt to create a sham issue of fact by tempering the prior testimony. For example, in paragraph 8e, Cizauskas states that he attempted to visit every landscape job as often as he could, but because New Image usually had several projects at the same time he could not engage in regular supervision and he "almost never visited the routine lawn maintenance jobs." (ECF No. 28-2 at PageID.811–812.) In contrast, Cizauskas previously testified that he "oversaw the whole operation of everything," that he went to every job to make sure it was being properly completed, and that New Image usually did not have multiple crews working on projects the same day (other than mowing), but if it did, he would go back and forth between the jobs. (ECF No. 24-1 at PageID.110, 117–18.)

Because Cizauskas's declaration is not entirely contradictory, the Court will not disregard it in its entirety but will disregard any statement that directly contradicts Cizauskas's prior testimony or suggests an attempt to create a sham issue of fact.

F.     The Workers' Employment Status

Only employees are protected by the FLSA; independent contractors are not covered by the FLSA. *Keller v. MIRI Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015). The FLSA defines the terms "employee" broadly as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "[e]mploy" as "to suffer or permit to work." 29 U.S.C. § 203(g). The question of whether an individual is an employee under the FLSA is a question of law. *Donovan v. Brandel*, 36 F.2d 1114, 1116 (6th Cir. 1984). However, "where there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts . . . the question is to be resolved by the trier of

fact in accordance with the appropriate rules of law." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.1 (6th Cir. 1992).

"Whether an employment relationship exists under a given set of circumstances is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011). Instead, in the Sixth Circuit, courts employ the "economic realities test," which "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself." *Lilley*, 958 F.2d at 750. Courts generally examine six factors in determining whether a worker is an employee or an independent contractor under this test: (1) the permanency of the relationship between the parties; (2) the degree of skill required for the rendering of the services; (3) the worker's investment in equipment or materials for the task; (4) the worker's opportunity for profit or loss, depending upon his skill; (5) the degree of the alleged employer's right to control the manner in which the work is performed; and (6) whether the service is an integral part of the alleged employer's business. *Brandel*, 736 F.2d at 1117 & n.5. No one factor is determinative. *Keller*, 781 F.3d at 807. "[R]ather, it is incumbent upon the courts to transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts of each case." *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) (internal quotation marks omitted).

1. Permanency of the relationship

This inquiry examines the length and exclusivity of the relationship. Independent contractors generally have "variable or impermanent" relationships with putative employers because they tend to have fixed periods of employment and transfer to wherever work is offered, while employees tend to work for a single employer and have continuous or indefinite

9

relationships. *Keller*, 781 F.3d at 807 (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998)). "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor." *Id.* However, even where the duration is short, an exclusive relationship between the worker and the company may weigh toward a finding an employment relationship. *Id.* In *Perez v Howes*, 7 F. Supp. 3d 715 (W.D. Mich. 2014), the court found that seasonal migrant workers who harvested pickle cucumbers during a brief 45-day season were employees. *Id.* at 727. Most of the workers stayed for the duration of the harvest and worked solely harvesting cucumbers during that time. In addition, there was no indication that the workers had other full-time jobs during the harvest or used the income from the harvest to supplement their income. *Id.* at 723–24.

The evidence shows that, while New Image workers' tenures varied, their relationship with New Image lasted much longer than that of the workers and the defendant in *Howes*. Not only was the landscaping season longer than the harvesting season in *Howes*, New Image also performed snow removal services during winter, making the working relationship effectively year-round for some employees. In addition, the Secretary has shown that a number of workers worked across multiple years (ECF Nos. 24-3, 24-13), and the workers typically worked in excess of 50 hours per week, precluding other full-time work. Although Cizauskas claims in his declaration that "[i]t was normal for the workers to do other landscaping jobs on their own" and that the workers "develop[ed] their own customers who [paid] them directly" (ECF No. 28-2 at PageID.812), he neither offers admissible evidence to support his assertions nor cites any specific example of a worker who performed jobs for his own customers. Moreover, as the Sixth Circuit recently observed:

> [W]hether a worker has more than one source of income says little about that worker's employment status. Many workers in the modern economy, including

relationships. *Keller*, 781 F.3d at 807 (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998)). "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor." *Id.* However, even where the duration is short, an exclusive relationship between the worker and the company may weigh toward a finding an employment relationship. *Id.* In *Perez v Howes*, 7 F. Supp. 3d 715 (W.D. Mich. 2014), the court found that seasonal migrant workers who harvested pickle cucumbers during a brief 45-day season were employees. *Id.* at 727. Most of the workers stayed for the duration of the harvest and worked solely harvesting cucumbers during that time. In addition, there was no indication that the workers had other full-time jobs during the harvest or used the income from the harvest to supplement their income. *Id.* at 723–24.

The evidence shows that, while New Image workers' tenures varied, their relationship with New Image lasted much longer than that of the workers and the defendant in *Howes*. Not only was the landscaping season longer than the harvesting season in *Howes*, New Image also performed snow removal services during winter, making the working relationship effectively year-round for some employees. In addition, the Secretary has shown that a number of workers worked across multiple years (ECF Nos. 24-3, 24-13), and the workers typically worked in excess of 50 hours per week, precluding other full-time work. Although Cizauskas claims in his declaration that "[i]t was normal for the workers to do other landscaping jobs on their own" and that the workers "develop[ed] their own customers who [paid] them directly" (ECF No. 28-2 at PageID.812), he neither offers admissible evidence to support his assertions nor cites any specific example of a worker who performed jobs for his own customers. Moreover, as the Sixth Circuit recently observed:

> [W]hether a worker has more than one source of income says little about that worker's employment status. Many workers in the modern economy, including

> employees and independent contractors alike, must routinely seek out more than one source of income to make ends meet. An income-based rule would deny that economic reality. It would also suffer from problems of practical application. Such a test would, for example, lead to classification of the same worker as an independent contractor during the periods in which she had more than one source of income but then as an employee during the (often brief) periods in between.

*Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1058 (6th Cir. 2019).

Finally, a number of workers have stated that they were financially dependent upon New Image. (*See* ECF No. 24-10 at PageID.276; ECF No. 24-11 at PageID.280.) Defendants have failed to refute this evidence.

Permanence thus favors an employment relationship.

### 2. The degree of skill required

This factor "must be evaluated with reference to the task being performed" by the workers. *Brandel*, 736 F.2d at 1118. The evidence points to but one conclusion: little or no skill was required to perform the tasks that were normally assigned to a worker. Cizauskas admitted that he did not require workers to have prior landscaping experience and that if a worker did not know how to do something, he would show them how to do it. (ECF No. 24-1 at PageID.118.) The degree of skill factors thus favors an employment relationship.

### 3. Worker's investment

The question here is whether the workers made a significant capital investment. *See Keller*, 781 F.3d at 810. "The capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the [company] to accomplish the task." *Brandel*, 736 F.2d at 1118–19.) Courts often apply this factor by comparing the worker's individual investment to that of the putative employer. *See e.g.*, *Perez*, 7 F. Supp. 3d at 725 (noting that the employer's "investment dwarfed that of the workers").

Here, the evidence shows that, compared to New Image's capital investment, the workers invested minimal amounts of their own funds. According to Cizauskas, *some* of the workers used their own tools or equipment such as rakes, shovels, and blowers, but the bulk of the equipment, and *all* of the major, capital-intensive equipment, including trucks, trailers, riding and push mowers, a skid steer, and a hydro seeder, were furnished by New Image. Moreover, New Image paid for the fuel for the trucks and equipment. This evidence demonstrates a significant degree of economic dependence. *See Keller*, 781 F.3d at 810 (noting that courts should assess whether a worker's capital investment demonstrates economic independence from the putative employer). Accordingly, this factor weighs in favor of employee status.

          4.         Opportunity for profit or loss

This factor "asks whether the workers had opportunities for profit or loss dependent on their managerial skill." *Off Duty Police Servs., Inc.*, 915 F.3d at 1059 (internal quotation marks and brackets omitted). That is, this factor may favor independent contractor status if the workers could increase their pay through exercise of managerial skill. *Id.*

Nothing in the record suggests that the workers could have increased their profits through managerial skill or that they were subject to a risk of business loss. The workers were assigned their jobs and could not, by working more efficiently, increase their earnings. The workers were paid an hourly rate regardless of how much work they completed. *See id.* (noting that the defendant's workers were required to work for set periods of time, regardless of the skill they exercised, and thus could not complete jobs more or less efficiently); *Howes*, 7 F. Supp. 3d at 725 ("Under the system in place, workers could simply increase their wages by working longer, harder, and smarter—this does not constitute an opportunity for profit."). And, even though New Image paid employees on a per-project basis in limited instances, "those, too, were flat payments that did

not depend on the skill applied by the worker." *Off Duty Police Servs., Inc.*, 915 F.3d at 1059. Because the workers had no opportunity to increase their profits, this factor weighs in favor of employee status.

        5.       Right to control

The inquiry here is whether the company "retain[ed] the right to dictate the manner" of the worker's performance. *Brandel*, 736 F.2d at 1119. Cizauskas testified in his deposition that he supervised all of New Image's jobs, including assigning workers to jobs and visiting each jobsite to ensure that the work was being performed properly and in accordance with the client's instructions. (ECF No. 24-1 at PageID.114.) If Cizauskas observed a worker doing something incorrectly, he showed the worker how to complete the task in the correct manner. (*Id.* at PageID.149–50.) Cizauskas also decided when a particular job was completed. (*Id.* at PageID.176.) This evidence shows that New Image exercised significant control over how the workers did their jobs. Defendants' effort to downplay, through Cizauskas's declaration, the degree of supervision Cizauskas asserted over the workers and the jobs falls flat in light of Cizauskas's prior deposition testimony that he oversaw all aspects of New Image's operations. Moreover, nothing in the record suggests that anyone other than Cizauskas had any say in how or what work was to be performed or a job completed. Accordingly, this factor weighs in favor of finding an employment relationship.

        6.       Workers' role in the business

This inquiry examines how important the worker's labor is to the employer's business. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employee-employer relationship." *Keller*, 781 F.3d at 815. The record in this case demonstrates that the workers were critical to New Image's business. Landscaping, lawnmowing,

13

and snow removal are labor intensive activities. Absent its workers, New Image could not have serviced its clients or performed the same number of jobs. Defendants present no evidence or argument to the contrary. Thus, this factor weighs in favor of an employment relationship.

### 7. Analyzing the factors

As noted above, the "central issue" in determining a worker's status is whether the worker was economically dependent on the putative employer. *Brandel*, 736 F.2d at 1120. All of the pertinent factors discussed above point in one direction: New Image's workers were economically dependent upon New Image. New Image obtained the jobs, assign tasks to low-skilled workers—many of whom worked for New Image for many months or even years—and controlled the manner in which the work was performed. Accordingly, the Court concludes that workers were employees entitled to the protections of the FLSA.

### G. Defendants' Violations

In light of the Court's conclusion that Defendants' workers were employees covered by the FLSA, there is no dispute that Defendants failed to comply with the FLSA's requirement to pay a non-exempt employee "at a rate not less than one and one-half times the regular rate at which he is employed" for all hours worked in excess of 40 in a workweek. 29 U.S.C. § 207(a)(1). The FLSA also requires employers to keep records documenting the hours that each employee works daily and weekly. 29 U.S.C. § 211(c). Such records must include the regular hourly rate of pay for any workweek in which overtime compensation is due, overtime premium paid, hours worked each workday, and total hours worked each workweek. 29 C.F.R. § 516.2. Defendants violated this requirement by deducting hours worked two-to-three times per week for lunch breaks the employees did not take, which resulted in underpayment for hours worked.

The Secretary has shown that Defendants owe $59,212.86 in back wages for the period of April 17, 2016 through August 22, 2017. Defendants do not dispute this calculation.

H. Liquidated Damages

In general, an employer who violates the FLSA is liable for back wages and an additional equal amount as liquidate damages. 29 U.S.C. §216(b). Liquidated damages "are compensation, not a penalty or punishment." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002). "The court may, in its discretion, refuse to award liquidated damages '*if, and only if,* the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act.'" *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991) (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982)) (emphasis in original). Absent such proof, a district court has no discretion to deny an award of liquidated damages. *Elwell*, 276 F.3d at 840. Moreover, the employer's burden of establishing good faith is "substantial." *Id.* at 836. To demonstrate good faith, an employer "must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 585 (6th Cir. 2004). "[A]n employer who negligently misclassifies an employee…is not acting in good faith." *Id.* at 584-85.

Defendants cite two bases for denying an award of liquidated damages, neither of which is persuasive. First, they point out that Cizauskas is unsophisticated, having only a high school education and blue collar work experience. Defendants further note that once Cizauskas learned that the DOL considered his workers employees under the FLSA, he changed his business practices and began treating workers as employees. However, Cizauskas admitted that he was aware of the overtime requirement but failed to take affirmative steps to ascertain whether his workers were, in fact, employees under the FLSA. (ECF No. 24-1 at PageID.175) In any event, ignorance is no

15

excuse. "A good heart but an empty head does not produce a defense." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986). Relatedly, Defendants argue that they acted in good faith because Cizauskas's accountant told him to treat the workers as subcontractors and pay them as 1099 contractors. (ECF No. 28-2 at PageID.809.) While Cizauskas says this in his declaration, his testimony from his deposition controls. There, he said that his first accountant told him that workers are independent contractors if they use their own vehicles to get to the jobsite and use their own equipment on the jobs. (ECF No. 24-1 at PageID.135–36.) Rather than telling Cizauskas what to do, the accountant merely provided guidelines that Cizauskas might consider. However, Cizauskas knew that the workers used New Image's vehicles to get to the jobsite and primarily used New Image's tools and equipment to perform the jobs, but never disclosed these facts to his accountants. These facts preclude a finding of good faith. *See Sec'y of Labor v. Timberline South, LLC*, 925 F.3d 838, 857 (6th Cir. 2019) (rejecting the defendant's reliance on advice from an accountant to establish good faith because the defendant knew that the accountant's advice was flawed or incomplete and the defendant never discussed the employees' duties with the accountant such that the defendant could have reasonably believed that the accountant was advising that specific employees were exempt).

Accordingly, Defendants fail to show that they acted in good faith and in a reasonable manner.

I. <u>Injunctive Relief</u>

The Secretary requests an injunction compelling Defendants to comply with the FLSA. *See* 29 U.S.C. § 217 (giving trial court discretion to enjoin FLSA violations). The issuance of an injunction under the FLSA is committed to the reasonable discretion of the trial court. *Wirtz v. Flame Coal Co.*, 321 F.2d 558, 560 (6th Cir. 1963). "The imposition of an injunction is not

punitive, nor does it impose a hardship on the employer since it requires him to do what the Act requires anyway—to comply with the law." *Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992) (internal quotation marks omitted). In determining whether to issue an injunction, a court should consider: (1) the employer's previous conduct; (2) the employer's current conduct; and (3) the dependability of the employer's promises for future compliance. *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657 (6th Cir. 1994). A court may decline injunctive relief if the employer demonstrates a bona fide attempt to comply or good faith, coupled with extraordinary efforts to prevent recurrence. *Martin*, 963 F.2d at 914. On the other hand, a pattern of repetitive violations or bad faith weigh heavily in favor of granting injunctive relief. *Id.*

Defendants argue that injunctive relief is unnecessary because, upon notification that New Image was violating the FLSA, Cizauskas took prompt steps to make the necessary changes. They further argue that there is no evidence that the violations are continuing and there is no reason to believe that future violations will occur. However, "current compliance alone, particularly when achieved by direct scrutiny of government, is not a sufficient ground for denying injunctive relief." *Brock v. Big Bear Mkt. No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987). Defendants likely violated the FLSA for years, prior to the period in question in this case, without seeking to ascertain the workers' correct status under the FLSA. Further, as the Secretary correctly notes, Defendants' assurances of future compliance are not particularly convincing, given Cizauskas' statements in his declaration that he "still believe[s] that the New Image workers could be considered [independent contractors]," and that he "disagree[s] with [the DOL's] conclusion" that the workers are employees. (ECF No. 28-2 at PageID.809–10.) Accordingly, injunctive relief is warranted.

## IV. Conclusion

For the reasons set forth below, the motion is granted. More specifically:

1. The undisputed evidence shows that, upon consideration of the "economic realities" of the landscape workers' relationship with New Image, the landscape workers were employees and not independent contractors;

2. the Secretary has shown that Defendants failed to comply with the FLSA's overtime and recordkeeping provisions;

3. the Wage and Hour investigator's calculation of back wages owed to 32 employees from April 17, 2016 through August 22, 2017 is not in dispute;

4. Defendants fail to show that Cizauskas acted in good faith and reasonably for purposes of avoiding an award of liquidated damages; and

5. injunctive relief is warranted in light of Cizauskas's continued insistence in his declaration that he still believes New Image's workers could be considered independent contractors, when the evidence presents a compelling case that the workers are, in fact, employees.

The Secretary's motion (ECF No. 23) is granted in its entirety. An Order consistent with this Opinion will issue.

Dated: December 2, 2019
/s/ Sally J. Berens
SALLY J. BERENS
U.S. Magistrate Judge